IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT A. PASTRICK, | ) | CASE NO.: 10-25689-jpk-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| STATE OF INDIANA ex rel. GREGORY F. | ) | Adversary Proceeding No. |
| ZOELLER, ATTORNEY GENERAL OF | ) | |
| INDIANA; and CITY OF EAST CHICAGO ex | ) | |
| rel. GREGORY F. ZOELLER, ATTORNEY | ) | |
| GENERAL OF INDIANA | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| ROBERT A. PASTRICK | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT TO EXCEPT DEBT FROM DISCHARGE

Plaintiffs State of Indiana *ex rel.* Gregory F. Zoeller, Attorney General of Indiana and

City of East Chicago, *ex rel.* Gregory F. Zoeller, Attorney General of Indiana ("Plaintiffs"),

creditors of the debtor Robert A. Pastrick ("Pastrick"), by counsel, for their Complaint to Except

Debt from Discharge, states as follows:

### JURISDICTION AND VENUE

1.      Pastrick filed a Voluntary Petition For Relief Under Chapter 7 of Title 11 of the

United States Code  (the "Bankruptcy Code") on December 17, 2010.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334, and Section 523 of the Bankruptcy Code.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(I).  This matter is properly brought as an adversary proceeding

pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

3.    Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

### STATEMENT OF FACTS RELEVANT TO ALL COUNTS

**A.    The Pastrick Political Machine**

4.    The City of East Chicago (the "City" or "East Chicago")  is a unit of local government known as a municipal corporation and a political subdivision of the State of Indiana. By virtue of its population having been at one time or another greater than 35,000 but less than 250,000, it is classified as a second-class city.  The powers of East Chicago are divided among its legislative, executive and judicial branches.  A power belonging to one branch of East Chicago's government may not be exercised by any other.

5.    Defendant Pastrick was elected to serve as the mayor of East Chicago in 1971 and was reelected every term through 2003.  Pursuant to Ind. Code §36-4-5-3,  Pastrick's duties as mayor included, among other things, enforcement of the ordinances of East Chicago and State statutes, calling special meetings of the legislative body when necessary, supervision of subordinate officers, ensuring efficient administration the City government, and approving or vetoing ordinances, orders and resolutions of the legislative body of the City.

6.    The Mayor is responsible for appointing the head of each department established by East Chicago's legislative branch, the Common Council.  East Chicago's Common Council consists of a nine-member body whose members are elected by residents of East Chicago every four years.  Pursuant to Indiana law, the Common Council has control over East Chicago's property and finances and the appropriation of money.  The Common Council, by ordinance, has

established the executive departments it considers necessary to perform the administrative functions of East Chicago.

7.      As Pastrick and his associates managed and operated the City, they drew little distinction between government affairs, political affairs, and personal affairs.  Job applications for government jobs included a signature line for the applicant's political sponsor.  Newly hired employees were presented with an opportunity to contribute a percentage of their salary, withdrawn from their paychecks, to a "flower fund" or "slush fund."  While contributions were supposed to be voluntary, it was understood that there were ramifications for not participating. The slush fund was used for political purposes, such as financing campaigns and purchasing signs.

8.      The Controller of the City of East Chicago, Edwardo Maldonado, who also served as the treasurer of what he called the political "machine," ran reports for Pastrick's office that identified which employees were contributing to Pastrick's political fund.  Pastrick and his associates also maintained as much as $25,000 - $30,000 in a safe in the Controller's office. Prior to the elections, the Controller would give Pastrick and his associates somewhere between $2,000-$5,000 in cash from the safe, which the Controller understood was used to pay poll workers.  There was no accounting of the cash that was maintained in the safe.

9.      During his mayoral administration, Pastrick and his associates caused the City payroll to increase markedly in the period leading up to elections when as many as 50-90 new employees were hired. Pastrick and his associates encouraged employees to vote for Pastrick. Contractors or consultants who were political allies received preferential treatment in the award of City contracts. Most City department heads also held leadership roles in the Pastrick political

organization.

10.     In the 2003 City election, Pastrick and his associates engaged in a coordinated effort to buy the votes of absentee voters by giving or promising them money.

**B.     The "Sidewalks for Votes" Scheme**

11.     The East Chicago Board of Public Works ("Board of Public Works") is a three-member body whose members are appointed by the Mayor of East Chicago.  Pursuant to Indiana law and the Municipal Code of East Chicago, the Board of Public Works controls and maintains custody of public sidewalks and has the legal authority to award contracts for public works projects to outside entities and individuals.  Because East Chicago is classified as a second class city, Indiana law requires East Chicago to obtain competitive bids on all public works projects estimated at more than $75,000 in order to safeguard the public against fraud, favoritism, graft, extravagance, improvidence, and corruption and to ensure honest competition for best work and supplies at the lowest and most responsive cost. Indiana law prohibits structuring work to avoid the $75,000 bid limit.

12.     In approximately June of 1998, the Board of Public Works initiated a "Street Improvement Program" in order to replace concrete public sidewalks in some portions of the City. While specifications were developed for the Street Improvement Program and contractor Rieth-Riley Construction Co., Inc. ("Rieth-Riley") submitted a bid to perform some of the work, the bid was not accepted and the Board of Public Works took no action on the proposed program.  In early 1999, the Board of Public Works again authorized public bids for a sidewalk improvement program, but again the Board took no action on the bids submitted.

13.     Notwithstanding the Board of Public Work's failure to approve the sidewalk

program, Pastrick induced contractors to perform millions of dollars of work on sidewalks and parking lots on public and private property beginning in February of 1999 and continuing until May 1999. During this time period, Pastrick knowingly and/or intentionally and in violation of local and State law, solicited, directed and authorized numerous contractors and sub-contractors (some of whom had no experience, permits, licenses, insurance or bonding) to pour concrete, trim and cut trees, and provided other services for residents, businesses and a church in East Chicago for non-public, political purposes. The Board of Public Works neither accepted lawful bids for any of this work, nor entered into any valid or legally binding contracts for any of it.

14.     On one occasion, Pastrick authorized work at a religious institution, Our Lady of Guadalupe Church.

15.     Pastrick and his associates arranged for and authorized contractors to receive millions of dollars of East Chicago's money and property as compensation for their participation in the Sidewalks for Votes Scheme, knowing that the contractors did not perform legitimate public work to earn such compensation, including the following activities: (a) authorizing and directing contractors to perform work on public and private residential property for political and non-public purposes; (b) authorizing and directing contractors to perform work for commercial businesses for political and non-public purposes; (c) authorizing and directing contractors to perform work for a church for political and non-public purposes; (d) pressuring contractors to complete work on or before the primary election on May 4, 1999; (e) ordering contractors not to perform work for certain citizens; (f) authorizing and allowing contractors to charge East Chicago excessive and non-competitive rates for the services provided by contractors; (g) allowing contractors to submit vague and incomplete billings and invoices for the services the

contractors provided; and (h) ordering contractors to structure proposals in amounts less than $75,000 to avoid Indiana law requirements for bids in excess of $75,000.

16.    The primary purpose of Pastrick in arranging for the unauthorized work described herein was to curry political favor with residents and thereby advance the political prospects of Pastrick and his slate of candidates, who were facing tough opposition in the May 1999 primary. The sidewalk/tree program served as the centerpiece for Pastrick's 1999 primary campaign. After the primary election on May 4, 1999, the unauthorized work stopped.

17.    Thereafter, Pastrick and his associates embarked on an effort to conceal and cover up the illegal sidewalk and tree program by creating false and misleading documents, including backdated contracts.   On July 30, 1999, Pastrick and Huey Whitman, the Group Manager for Rieth-Riley, executed a contract titled as "Assignment of Bid and Right to Contract."  This assignment contract falsely stated that the Board of Public Works had approved Rieth-Riley's entire bid for the Proposed 1998 Street Improvement Project described herein and made no reference to the fact that the work contemplated by this assignment contract had already been completed by other contractors, including one or more of the designated assignees.

18.    The City informed the contractors that had completed this work that they would be paid at the rate set forth in the 1998 Rieth-Riley bid, which called for a payment of $5.08 for each square foot of poured concrete.  However, contractors who were connected to the Pastrick political machine received additional payments above $5.08 per square foot.  These preferential payments to a handful of contractors were made a substantial period of time after the work had been completed.

19.    The City, under Pastrick's control, paid contractors that had supported the Pastrick

political machine millions of additional dollars as part of the cover-up.

20.    In total, Pastrick caused the City to pay $23,993,005.53 to contractors as part of the sidewalk and tree trimming scheme.  Payments were made to the contractors via check and wire transfer.  The checks or their electronic representations proceeded through a financial institution's clearinghouse in Chicago, Illinois, or the Federal Reserve Bank of Chicago, and then back across state lines to National City Bank in East Chicago, Indiana.  As a result of the City's spending, members of the Pastrick racketeering enterprise entirely depleted the City's general fund by May 1999, at which time the City's general fund bank account was overdrawn by several million dollars.

### D.    The Showboat Casino Agreement

21.    In 1993, the Indiana General Assembly passed the Indiana Riverboat Gambling Act, which authorized the Indiana Gaming Commission to issue a restricted number of licenses to private concerns that wished to establish riverboat casinos with the State.  In particular, this Act provided for the Gaming Commission to issue one license for a riverboat casino located in East Chicago. Before the Gaming Commission could issue the license, however, by statute East Chicago had to pass an ordinance permitting a riverboat casino to dock within the city, and the residents of East Chicago had to pass a referendum in two separate elections approving generally the issuance of a license for a riverboat casino to be located in East Chicago.  Only after East Chicago and its residents separately approved the operation of a riverboat casino within the City would the Gaming Commission consider applications for a license to operate in East Chicago.

22.    The Riverboat Gambling Act sets forth a rigorous application process for prospective licensees.  Among other things, applicants are required not only to show their

financial stability, but also to demonstrate how they would provide for the economic development of the city where the riverboat casino would be located.

23.     On April 8, 1994, the Showboat Marina Casino Partnership ("Showboat") entered into an Agreement with East Chicago ("Showboat Agreement") whereby Showboat agreed, among other things, to make economic development payments totaling 3% of Showboat's adjusted gross receipts (as defined in the Indiana Riverboat Gambling Act) in the event Showboat received a license from the Indiana Gaming Commission and began operating a casino.  The Showboat Agreement specified that these payments would be allocated as follows: 1% to the City of East Chicago; 1% to the Twin City Education Fund (a private foundation); and 1% to the East Chicago Community Foundation (a private foundation).  The two foundations have since been consolidated into one non-profit foundation called the Foundations of East Chicago, Inc. ("the Foundations").

24.     Under Pastrick's control, the City and Showboat also agreed that the Casino would divert an additional 0.75% of Showboat's adjusted gross receipts to Second Century, Inc., a for-profit corporation.

25.     Among other things, these promised payments were an inducement for the East Chicago Common Council to pass, as it did, the necessary ordinance.  Also in exchange for these promised payments, East Chicago explicitly agreed to support Showboat's application for a casino owner's license to the Indiana Gaming Commission.  Such support in front of the Gaming Commission was significant especially in light of Showboat's need to demonstrate the adequacy of its plan to provide East Chicago's economic development.

26.     Pastrick, in his capacity as Mayor of East Chicago, accepted the Showboat

8

Agreement on behalf of the City of East Chicago, subject to the approval of the Common

Council of East Chicago.

27.     On September 11, 1995, in Resolution R-95-0009, the Common Council ratified

the Showboat Agreement, including the 1% payment to the City and the 2% payments to the

Foundation.

28.     The Indiana Gaming Commission issued Showboat a "Certificate of Suitability"

on February 27, 1996, and a five-year license to operate a riverboat casino in East Chicago on

April 15, 1997.  Showboat commenced full-time gambling at its East Chicago casino on April

18, 1997.

**E.      The Diversion of Showboat Agreement Proceeds into the "Gaming Trust"**

29.     On June 1, 1996, Pastrick, via Executive Order 96-01, established the Executive

Finance Committee of East Chicago (the "Executive Finance Committee").  The purpose of the

Executive Finance Committee was, among other things, to make recommendations to the Mayor

and the Controller of East Chicago on the allocation of East Chicago's Showboat Agreement

proceeds among East Chicago departments and projects.

30.     On or about August 7, 1996, Pastrick, without the approval of the Common

Council, and having no executive authority to divert the money and property of East Chicago

without that approval, executed a "Gaming Trust," naming the East Chicago Controller as

Trustee. Among the powers of the Trustee was the power to allocate, upon the recommendation

of the Executive Finance Committee, East Chicago's proceeds from the Showboat Agreement.

31.     However, Pastrick, by creating the Executive Finance Committee and the Gaming

Trust, and by appointing the City Controller also to serve as the Trustee of the Gaming Trust,

created an unlawful apparatus through which he could bypass the Common Council's power and responsibility to appropriate City money and property. Unlike the authorization for payments to the Foundations, the Common Council passed no prior approval or appropriation for Pastrick's scheme to divert East Chicago's share of the Showboat Agreement proceeds into the Gaming Trust. This scheme enabled Pastrick to retain sole power and discretion to decide how East Chicago's Showboat Agreement Proceeds would be spent.  In short, Pastrick established a scheme to unlawfully divert East Chicago's Showboat Agreement proceeds into his own personal fund, which he then spent without appropriation.

32.     Showboat began issuing checks to the City of East Chicago in 1997 in payment of its obligations under the Showboat Agreement.  These payments should have been deposited into East Chicago's General Fund, but were instead received by the City Controller, or someone acting at his direction, and deposited into the Gaming Trust at National City Bank in East Chicago.

33.     Each such diversion to the Gaming Trust was an unauthorized use of East Chicago's money and property and constituted theft under Indiana law.

**F.     The Bond Issuance Program**

34.     Once the City's general fund was exhausted in 1999 and its bank account overdrawn following the Sidewalk for Votes Scheme, Pastrick and other members of his racketeering enterprise embarked on a "second stage" to finance the Sidewalk for Votes Scheme.

35.     First, the City used funds that were appropriated and unlawfully diverted to the Gaming Trust by Pastrick.

36.     Second, members of the Pastrick enterprise arranged for improper bond

authorizations and appropriations by the Common Council by concealing the fact that public money previously spent on the sidewalk scheme had neither been paid pursuant to properly accepted public bids, nor appropriated by the Common Council.  Prior to June 15, 1999, Pastrick conspired with others to request the Common Council issue emergency appropriations and financing, while concealing from the Common Council that such funding would be used to pay contractors for unauthorized concrete work, tree trimming and other services that had unlawfully been completed.  The Common Council approved such appropriations by virtue of Ordinance 0-99-0006 and 0-99-0008.  Ordinance 0-99-0006 requested the Common Council to appropriate an additional $14 million "for the purpose of defraying certain expenses," which included $13.5 million for "contractual services" and a $450,000.00 disbursement for "capital outlay." Members of Pastrick's racketeering enterprise orchestrated the approval of an ordinance authorizing the City to issue municipal bonds not to exceed $15 million and to issue bond anticipation notes not to exceed $15 million to pay the cost of certain capital improvements in the City.

37.    Ordinance 0-99-0006 made no indication that the City had paid, and intended the proceeds from the bond anticipation notes to pay, contractors who had performed work on public and private property in violation of Indiana and municipal bidding and appropriation laws.  In addition, Ordinance 0-99-0006 falsely represented that the source of the appropriated money was "solely from wagering tax and admissions tax distribution that have been received as a result of the gaming industry during the year ending December 31, 1999 . . ." and did not disclose another contemplated source of the appropriated money, the sale of municipal bonds.

38.    Ordinance 0-99-0008 misrepresented that East Chicago had properly hired a

11

consulting engineer to design, estimate and advertise a project involving a "program to reconstruct curbs, sidewalks, and similar concrete structures within East Chicago limits . . . . "

39.     Following the approval by the Common Council of the ordinances referred to herein, Pastrick, in concert with his associates, executed a plan to falsely fulfill the prerequisites for issuing the bonds and selling the bond anticipation notes approved by ordinances, namely by causing fabrication of documents to conceal the fact that the work performed pursuant to the "Sidewalk for Votes" scheme had already been completed.

40.     In the Summer of 1999, Pastrick and his associates, contacted Rieth-Riley and informed it of their desire to accept a bid previously submitted by Rieth-Riley in 1998 for the defunct proposed 1998 Street Improvement Project.  Rieth-Riley initially refused the offer, but ultimately accepted it.

41.     Ultimately, Pastrick and Rieth-Riley executed a contract titled an "Assignment of Bid and Right to Contract," (the "Agreement"), effective as of July 30, 1999.  A true and correct copy of the Agreement exclusive of Exhibit "A" is attached as Exhibit "1."  The Agreement falsely states that the Board of Public Works had approved Rieth-Riley's entire bid for the proposed 1998 Street Improvement Project (rather than just the asphalt portion) and made no reference to the fact that the work contemplated by the Agreement had already been completed by contractors other than Rieth-Riley.

42.     Bond anticipation notes were issued in July of 1999 and generated proceeds of $13.75 million that were used to pay contractors for as yet uncompensated work related to the sidewalk scheme and to replenish City bank accounts that had been depleted as a result of the money paid to sidewalk and tree contractors.

43.     The City paid $1,221,270.24 in interest on the bonds, $171,875.00 in underwriter fees, and $75,690.74 in legal fees related to the bond issuance program.  It also paid $150,000.00 to consulting companies operated by Pastrick's political cohorts for services rendered in relation to the bond anticipation notes.

### G.     The Aftermath

44.     When Pastrick left office, the City's general fund had a deficit of $17 million. The projected budget shortfall was approximately $5.5 million.  The City payroll had grown to over 1,045 employees, far in excess of the comparably sized Michigan City.  Because of Pastrick's longterm pattern of fraud and political corruption, the City was placed in a state of disrepair.  The City's streets and sewers were in desperate need of repair or replacement, and abandoned buildings were prevalent on the landscape and could not be demolished due to lack of funding.

45.     East Chicago paid $1,662,801.00 for legal representation for members of Pastricks' enterprise that were ultimately convicted for defrauding the City.

### H.     The Litigation

46.     On August 3, 2004, Plaintiffs filed a complaint in the United States District Court for the Northern District of Indiana alleging that, between 1996 and 2004, Pastrick and others unlawfully engaged in the management and operation of the City as a racketeering enterprise through a pattern of racketeering activity in violation of federal and Indiana state law; committed theft and official misconduct under Indiana state law; and were unjustly enriched as a result of their actions.

13

47.     In their complaint, Plaintiffs alleged that Pastrick committed racketeering offenses and participated in conspiracies to commit racketeering offenses in violation of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), Title 18, § 1962(c) and (d).  Plaintiffs also alleged Pastrick violated Indiana's "Little RICO" statute, Ind. Code § 35-45-6 *et seq*., and committed theft as defined by Ind. Code § 35-43-4-2.

48.     On March 11, 2010, following an evidentiary hearing at which Pastrick was fully represented, the United States District Court entered an Opinion and Order (the "Judgment") against Pastrick and others in favor of East Chicago in the sum of $108,007,584.33, all of which remains unpaid.  A true and correct copy of the Judgment is attached hereto and made a part hereof as Exhibit "2."

49.     The Judgment has conclusively established that, by operating the Pastrick political machine to benefit himself both personally and politically and by orchestrating the "Sidewalks for Votes" scheme and the subsequent bond issuance program, Pastrick:

- Violated 18 U.S.C. § 2314, a "predicate act" giving liability under RICO,  18 U.S.C. §1962 (c) and (d), by engaging in: (1) the repeated and continuous instances of the transfer or transmittal in interstate commerce of money known to have been stolen, converted, or taken by fraud; and (2) a conspiracy to do the same;

- Violated Indiana's Little RICO statute through repeated and continuous instances of theft and official misconduct constituting racketeering activity. In connection with this pattern of racketeering activity, Pastrick: knowingly and intentionally received proceeds derived from the pattern of racketeering activity, and used those proceeds (and the proceeds derived from them) to establish and operate their enterprise; knowingly and intentionally acquired and maintained an interest in or control in the enterprise; and were employed by or associated with the enterprise while knowingly and intentionally participating in the enterprise's pattern of racketeering activity; and

14

- Committed theft (as defined by Indiana law), and therefore is civilly liable under the Crime Victims Act, by knowingly and intentionally exerting unauthorized control over property and money belonging to the City, with the intent to deprive the City of any part of the value or use of that property and money.

50.    The Judgment conclusively established that Pastrick is indebted to East Chicago for $27,274,642.51 in actual damages incurred by Plaintiffs stemming from the wrongful conduct of Pastrick.  This amount includes the sum of moneys paid to contractors in the Sidewalk for Votes Scheme, interest and other charges related to the issuance of bonds to conceal the Sidewalk for Votes Scheme, and attorneys' fees paid to defending City officials for criminal charges relating to the conduct described herein for which they were ultimately convicted.

51.    The Judgment conclusively established that Pastrick is indebted to East Chicago for prejudgment interest in the sum of $8,727,885.60 pursuant to Ind. Code § 34-51-4-8 for a period of forty-eight (48) months.

52.    The Judgment conclusively established that Pastrick is indebted to East Chicago under Indiana's Little Rico statute, and the Indiana Crime Victims Act, Indiana Code § 34-24-3-1, in an amount equal to three (3) times the amount of actual damages, which sum is $108,007,584.33.

53.    The District Court's findings of the indebtedness of Pastrick to East Chicago, and Pastricks violation of the above-referenced Federal and State laws are binding pursuant to the doctrine of collateral estoppel.  The State of Indiana will prove damages in an amount to be determined at trial.

54.    The acts and omissions of Pastrick described in the Statement of Facts Relevant to All Claims were done knowingly and intentionally, without just cause or excuse.

**COUNT I**
**Exception from Discharge Pursuant to Bankruptcy Code Section 523(a)(6)**

55.     For Count I of their Complaint, Plaintiffs incorporate the allegations set forth in the preceding paragraphs 1 through 54 and further state as follows:

56.     The indebtedness of Pastrick to Plaintiffs stems from willful and malicious injury to property of Plaintiffs.

57.     Without limiting the generality of the foregoing paragraphs in this Count, Pastrick orchestrated the Sidewalk for Votes Scheme and the Bond Issuance Program and diverted the Showboat Agreement proceeds into the Gaming Trust in conscious disregard of his duties and without just cause or excuse and caused damages to Plaintiffs which he either desired and/or believed were substantially certain to result from his actions.

58.     Additionally, Pastrick committed "theft" as defined by to Ind. Code § 34-43-4-2 by knowingly or intentionally exerting unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use.  Pastrick's theft and the indebtedness to East Chicago, including treble damages pursuant to Ind. Code § 34-24-3-1, has been established by the District Court and is binding on Pastrick pursuant to the doctrine of collateral estoppel.

59.     Further, Pastrick violated RICO by the repeated and continuous instances of the transfer or transmittal in interstate commerce of money known to have been stolen, converted, or taken by fraud, and conspiracy to commit same. Pastrick's violation of RICO and the indebtedness to East Chicago, including treble damages pursuant to 18 U.S.C. § 1964(c) and (d) has been established by the District Court and is binding on Pastrick pursuant to the doctrine of collateral estoppel.

16

60.     Pastrick also violated Indiana's Little RICO statute by engaging in "racketeering activity" as defined by Ind. Code § 35-45-6-1 by: (1) committing official misconduct as defined by Ind. Code § 35-44-1-3 by knowingly and intentionally performing an act that he was forbidden by law to perform, and/or performing an act that he is not authorized by law to perform, with intent to obtain any property for himself; and (2) committing theft as defined by to Ind. Code § 34-43-4-2.  Pastrick's violation of Little RICO and the indebtedness to East Chicago, including treble damages pursuant to Ind. Code § 34-24-2-6(b), has been established by the District Court and is binding on Pastrick pursuant to the doctrine of collateral estoppel.

61.     Through Pastrick's acts and omissions set forth in this Count, Plaintiffs have been damaged in an amount not less than the Judgment.

**WHEREFORE**, Plaintiffs respectfully request judgment against Pastrick declaring the indebtedness of Pastrick to Plaintiffs be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(6) in an amount not less than the amount of the Judgment and interest thereon and further that the Court grant Plaintiffs all other just and proper relief.

**COUNT II**
**Exception from Discharge Pursuant to Bankruptcy Code Section 523(a)(4)**

62.     For Count II of their Complaint, Plaintiffs incorporate and restate the allegations set forth in the preceding paragraphs 1 through 61 and further state as follows:

63.     As an elected public official, Pastrick held an office of trust and owed fiduciary duties to both the State of Indiana and the City of East Chicago and its respective taxpayers.

64.     The indebtedness of Pastrick to Plaintiffs stems from fraud or defalcation while acting in a fiduciary capacity.

17

65.    Without limiting the generality of the foregoing paragraphs in this Count, in his capacity as Mayor of East Chicago, Pastrick knowingly misappropriated, misused and failed to account for public funds, which he unlawfully used to pay cohorts in furtherance of his own political goals, to the detriment of the City and the State.

66.    Pastrick's execution of the Gaming Trust unlawfully transferred an interest in property of the City and diverted funds which should have gone to the General Fund to the Gaming Trust.  Pastrick's actions exceeded his authority pursuant to Indiana Code § 36-4-5-3. Pastrick willfully and wrongfully executed the Gaming Trust with the fraudulent intent to divert money from the City for his own political benefit which action constitutes larceny.

67.    To the extent that it is determined that Pastrick was entrusted with the City's interest in the Showboat Agreement proceeds, then Pastrick fraudulently appropriated such proceeds by his execution of the Gaming Trust.

68.    Without limiting the generality of the foregoing paragraphs in this Count, Pastrick was entrusted with money and public funds belonging to the City and to taxpayers, which, with fraudulent intent, he misappropriated by using and consuming such money for purposes other than which it was lawfully authorized as set forth in paragraphs 11 through 40.

69.    Plaintiffs have been damaged in an amount not less than the Judgment.

**WHEREFORE**, Plaintiffs respectfully request judgment against Pastrick declaring the indebtedness of Pastrick to Plaintiffs be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(4) in an amount not less than the amount of the Judgment and interest thereon and further that the Court grant Plaintiffs all other just and proper relief.

18

### COUNT III
### Exception from Discharge Pursuant to Bankruptcy Code Section 523(a)(7)

70.     For Count III of their Complaint, East Chicago incorporates the allegations set forth in the preceding paragraphs 1 through 69 and further state as follows:

71.     The statutory damages awarded East Chicago against Pastrick represent a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit that is not compensation for actual pecuniary loss.

**WHEREFORE**, East Chicago respectfully requests judgment against Pastrick declaring the indebtedness of Pastrick to it be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(7) in an amount not less than the statutory damages awarded East Chicago in the Judgment and interest thereon and further that the Court grant Plaintiffs all other just and proper relief.

### COUNT IV
### Exception from Discharge Pursuant to Bankruptcy Code Section 523(a)(13)

72.     For Count IV of their Complaint, East Chicago incorporates the allegations set forth in the preceding paragraphs 1 through 71 and further state as follows:

73.     The indebtedness of Pastrick to East Chicago is an Order of Restitution under Title 18 of United States Code and accordingly is excepted from discharge pursuant to Bankruptcy Code Section 523(a)(13).

**WHEREFORE**, East Chicago respectfully requests judgment against Pastrick declaring the indebtedness of Pastrick to it be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(13) in an amount not less than the amount of the Judgment and interest thereon and further that the Court grant Plaintiffs all other just and proper relief.

## COUNT V
## Exception from Discharge Pursuant to Bankruptcy Code Section 523(a)(2)(A)

74.    For Count V of their Complaint, Plaintiffs incorporate the allegations set forth in the preceding paragraphs 1 through 73 and further state as follows:

75.    As set forth in the preceding paragraphs 33 through 42, Pastrick sought a solution to pay for the significant illegal and unauthorized expenditures for the Sidewalk for Votes Scheme by conspiring with others to convince the Common Council to authorize the borrowing of money through issuance of bond anticipation notes.

76.    Pastrick and his conspirator's failure to disclose to the Common Council the reason for the City's dire need for funds, namely the millions of dollars in work which had been improperly authorized as part of the Sidewalk for Votes Scheme, resulted in the City borrowing money to help pay for the scheme.

77.    Pastrick executed the Agreement with Rieth-Riley knowing that the work ostensibly contemplated by the Agreement had already been performed by contractors other than Rieth-Riley.  Pastrick executed the Agreement to support and to legitimize and conceal the earlier unauthorized work performed as part of the Sidewalks for Votes Scheme.

78.    The statements by Pastrick's co-conspirators regarding the City's dire need for funding and intentional omissions of material facts to the Common Council regarding the true cause of the lack of funds and Pastrick's execution of the Agreement constitute false pretenses, false representations and or actual fraud.

79.    As a result of Pastrick's actions and intentional omissions of material fact, the City incurred debt and suffered pecuniary injury in an amount not less than the $13.5 million borrowed by the City pursuant to the bond anticipation notes, plus interest paid by the City and attorney's

fees incurred in connection with approval and issuance of bond anticipation notes, all of which should be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A).

80.    Further, the Judgment of the District Court conclusively determined that Pastrick had violated 18 U.S.C. § 2314, a "predicate act" giving liability under RICO, 18 U.S.C. § 1962 (c) and (d), by engaging in: (1) the repeated and continuous instances of the transfer or transmittal in interstate commerce of money known to have been stolen, converted, or taken by fraud; and (2) a conspiracy to do the same. Such finding is binding upon Pastrick in this action pursuant to the doctrine of collateral estoppel.

81.    Pastrick's violation of 18 U.S.C. § 2314 and intentional omissions of material fact concerning the City's dire need for funds constitutes false pretenses, false representations and or actual fraud, and accordingly the indebtedness stemming therefrom pursuant to RICO should be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A).

**WHEREFORE,** Plaintiffs respectfully request judgment against Pastrick declaring the indebtedness of Pastrick to Plaintiffs be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2) in an amount not less than $13.5 million, plus interest and attorney's fees incurred and paid by Plaintiffs with respect to the approval and issuance of bond anticipation notes and further that the Court grant Plaintiffs all other just and proper relief.

Respectfully submitted,

RUBIN & LEVIN, P.C.
Attorneys for the State of Indiana *ex rel.* Gregory F.
Zoeller, Attorney General of Indiana and the City of
East Chicago *ex rel.* Gregory F. Zoeller, Attorney
General of Indiana

By:/s/   James E. Rossow, Jr.
       James E. Rossow, Jr., Atty No. 21063-29
       Christopher M. Trapp, Atty. No. 27367-53
       342 Massachusetts Ave., Ste. 500
       Indianapolis, IN 46204
       (317) 860-2893; Fax (317) 453-8610
       Jim@rubin-levin.net
       Ctrapp@rubin-levin.net
       JER/CMT

C:\Documents and Settings\ctrapp\My Documents\Complaint to Except Debt from Discharge 3 25 11.wpd